**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 09-cv-01796 REB-MEH

ESTATE OF ANTHONY L. SIMS, By Kathie Sims as Personal Representative,

    Plaintiff,

v.

JEFFERSON COUNTY SHERIFF TED MINK, in his individual and official capacities; and JOHN DOE SHERIFF'S DEPUTY, in his individual and official capacities.

    Defendants.

_____

**AMENDED COMPLAINT AND JURY DEMAND**
_____

    Plaintiff, the Estate of Anthony L. Sims, by Kathie Sims as Personal Representative, and through the Estate's attorneys, David A. Lane and Sara J. Rich of Killmer, Lane & Newman, LLP, respectfully alleges for the Amended Complaint and Jury Demand as follows:

### I. INTRODUCTION

    1.    Anthony L. Sims, a 20-year-old man, was held as a pretrial detainee in Jefferson County Detention Facility on allegations of aggravated sexual assault on a child. Due to the nature of the charges, and out of fear for his safety, Anthony requested during intake that he be placed in protective custody ("PC"). Anthony was placed in protective custody/administrative segregation. Unfortunately for Anthony, the disciplinary/administrative segregation ("Adseg") unit of Jefferson County Detention Facility, adjacent to the pc unit, was also housing Shawn Shields, a known violent leader of a white supremacist prison gang. Shields, who was in Jefferson County Detention Facility awaiting trial on charges of assaulting a fellow inmate, who

had also murdered a fellow inmate, was being held in administrative segregation based on his documented history of violence and assaults against other inmates. Defendants' failure to maintain proper security between Shields, who was prone to violence, and Anthony, who was vulnerable to such attacks, led directly to Anthony's murder.

2.     This is an action for damages and other relief arising under the United States Constitution and the laws of the United States. Defendants violated the rights of Anthony Sims, the deceased son of Kathie Sims, under the Fourteenth Amendment to the Constitution of the United States of America when Defendants knowingly and with deliberate indifference to his constitutional rights, failed to protect and secure Anthony, a vulnerable pretrial detainee being held in protective custody, from known dangerous inmates being held in administrative segregation.

3.     Defendants' conduct under color of state law proximately caused the deprivation of Plaintiff's federally protected rights. Defendants' conduct was done willfully and wantonly or with reckless disregard of Plaintiff's federally protected rights.

## II. JURISDICTION AND VENUE

4.     This action arises under the Constitution and laws of the United States, and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

5.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

### III. PARTIES

6. At all times pertinent hereto, the decedent, Anthony L. Sims, was a citizen of the United States of America and detained in the State of Colorado by officials of Jefferson County, Colorado.

7. At all times pertinent hereto, Kathie Sims, personal representatives of the Estate of Anthony Sims and mother of Anthony Sims, was a citizen of the United States of America and resident of the State of Alabama.

8. At all times relevant to the subject matter of this litigation, Defendant Sheriff Mink was a citizen of the United States and a resident of Colorado and was acting under color of state law in his capacity as Sheriff of Jefferson County, Colorado.

9. Upon information and belief, at all relevant times, Deputy John Doe was employed as a Deputy by Jefferson County Sheriff's Department and was acting within the scope of his official duties and employment, under color of state law.

### IV. FACTUAL BACKGROUND

10. During the relevant time period, Anthony Sims was a pretrial detainee within the Jefferson County Detention Facility ("JCDF") in Golden, Colorado, held on allegations of aggravated sexual assault on a child.

11. When Anthony was taken into custody he specifically requested that he be placed in protective custody because of the nature of the allegations against him. Anthony had never spent time in jail and he was aware that the type of allegations against him, sexual assault on a child, would subject him to an increased risk of harm.

12. Inmates who are alleged to have committed sex offenses or are labeled a sex offender are singled out for harsh treatment by other inmates.

3

13. Anthony Sims was described as psychologically troubled and abnormally immature. While Anthony was incarcerated in the JCDF he met with a mental health care provider on a regular basis due to his psychological state.

14. Anthony met with a counselor several times a week and the counselor, a Jefferson County employee, was well aware of his fears regarding his safety in jail and his general vulnerability.

15. An inmate can be placed in PC at the JCDF if it is determined that his well being is in jeopardy. Additionally, Adseg is utilized for inmates who present a serious threat to the safety of other inmates, property or to the security and orderly operation of the JCDF.

16. Anthony was placed in protective custody, while being detained at the JCDF because he feared for his safety due to the allegations against him and because his well being was in jeopardy.

17. Anthony was housed in cell 46 in the PC unit.

18. Another inmate, Goodloe, was also being held in protective custody and was held next to Anthony in cell 48.

19. The inmates held in cells 46 and 48 share the use of a dayroom. The inmates in cells 46 and 48 can access the dayroom when the door to their cell is opened by a deputy in the control tower. The deputies open and close these doors electronically from the control tower without being physically present in the day room.

20. The inmates held in cells 46 and 48 are not allowed to access the day room at the same time in order to maintain their physical segregation from each other.

21. The special units at the JCDF include cells 46 and 48, where Anthony and Goodloe were housed, as well as cells 42 and 44. Cells 42 and 44 are designed the same as cells

46 and 48 in that they share the use of a day room that can be accessed when a deputy in the control tower opens those cell doors.

22.     Shawn Shields was housed in cell 42.  Shawn Shields is a high level member of a white supremacist prison gang called the Aryan Syndicate.

23.     Shields had been transferred from the Colorado State Penitentiary ("CSP") -- Colorado's "supermax" prison -- to JCDF.    The Colorado State Penitentiary is a Level V security correctional institution for adult male offenders which houses the department's most violent, dangerous and disruptive offenders.

24.     Shields had been transferred to JCDF to await trial on charges of assaulting another inmate who was held in a cell with him.

25.     The documentation that was provided to the JCDF regarding Shields indicated that he had been transferred from CSP and that he was being held pending charges of assaulting another inmate.

26.     Defendants were well aware of Shields' propensity for violence and attack on other inmates.

27.     Shields was housed in the administrative segregation unit in order to separate him from the general population for the safety and security of the other inmates.

28.     Upon information and belief, while he was incarcerated at the JCDF, Shields learned that Anthony was charged with aggravated sexual assault on a child.

29.     The day room for cells 46/48 and the day room for cells 42/44 were connected by a shower which was used by the occupants of the four cells in the special unit.

30.     The shower that was used by each of the four men housed in cells 46/48 and 42/44 was designed with a sallyport that was equipped with manual locks on the doors on either

5

side of the shower. The door on one side of the shower entered the day room for cells 46/48 and the door on the other side of the shower entered the day room for cells 42/44.

31.     Unlike the doors of the individual cells which were controlled by a deputy in the tower, the doors to the shower in between the two day rooms was equipped with a manual lock which was accessed by the deputy on the tier outside the housing area.

32.     When an inmate in either the PC or the Adseg units wanted to use the shower he was required to contact a deputy and request that the door entering the shower from the day room be unlocked, and the other door entering into the other day room be locked in order to keep the PC inmates segregated from the Adseg inmates.

33.     From their position on the outside tier, the deputies were unable to confirm that the shower door was actually locked. In order to confirm the locking mechanism was engaged, a deputy had to enter the day room and personally attempt to open the shower door.

34.     Instead of the deputy entering the day room and confirming that the door was locked, the custom, practice and policy of the JCDF that was enforced by Sheriff Mink and followed by the deputies, was to request that the inmate pull on the door and rely upon the inmate to confirm the door was locked.

35.     The deputy then manually unlocked the other door on the other side of the shower.

36.     The inmates could manipulate the door to make it appear to the deputy standing on the tier outside that the door was locked, when in fact the door was not locked. The inmates from cells 42/44 (Adseg) could then access the day room for cells 46/48 (PC) through the unlocked shower doors.

37. Defendants were aware that the inmates were able to manipulate the locking mechanism on the doors in the administrative segregation unit's shower to appear as if they were locked when they were not.

38. Upon information and belief, inmate-on-inmate assaults have occurred in the special unit at Jefferson County due to the failure of the deputies to ensure that the doors allowing access to the showers were securely locked.

39. Upon information and belief, Shields entered into Anthony's day room numerous times by manipulating the locks on the shower room doors.

40. The locks on the shower room doors were left unlocked so many times that Anthony had a hand written note which stated "Both of the shower doors are unlocked."

41. Upon information and belief, Anthony would hold this sign up in the window of his cell to notify the deputies on duty when he was aware that the shower doors separating his day room from Shields' were unsecured, thus, allowing Shields unobstructed access into Anthony's day room and to Anthony himself if his cell door was unlocked.

42. Jefferson County Sheriff's Deputies witnessed Shields in the day room for cells 46/48 (PC) but did nothing to stop his access nor did they take additional precautions to ensure he was not able to enter the other day room where Anthony was held.

43. On November 1, 2005 Anthony contacted Defendant John Doe and asked that the door to his side of the shower be unlocked so that he could use the shower. Defendant John Doe unlocked the door on Anthony's side of the shower and attempted to lock the door to Shields' day room. Shields manipulated the lock to make it appear as if the door had locked when it had not. Defendant John Doe failed to personally confirm that the door to Shields' day room was locked and merely took Shields word for it.

7

44. Upon information and belief, after Anthony finished showering, Shields entered Anthony's day room where he physically attacked Anthony and killed him by strangulation with a tube sock. Shields left Anthony in his cell on his bed and returned to his cell.

45. At some point later a deputy electronically closed Anthony's cell door from the control tower leaving him locked in his cell, dead.

46. Anthony Sims was found by the deputies "unresponsive" in his cell around 5:00 p.m. on November 1, 2005.

47. Anthony was found with a tube sock tied around his neck as the top of his body was laying face down on the bed with his legs on the floor.

48. There was blood found in Anthony's cell, including a large spot of blood on the bed where his head was resting.

49. The right side of Anthony's face was severely beaten, bruised and swollen, particularly around his right eye.

50. Dr. Ben Galloway performed an autopsy of Anthony's body on November 3, 2005.

51. Members of the Jefferson County Sheriff's Office and the Jefferson County District Attorney's' Office attended the autopsy of Anthony Sims.

52. On November 14, 2005 Kathleen Battan, a Jefferson County Investigator, informed Anthony's mother that she "had investigated this case thoroughly and there was no evidence of second party involvement" in Anthony's death.

53. The death certificate, issued on November 15, 2005, indicated "suicide" as the cause of death, explaining that the "suspect tightened sock around neck."

54. On November 17, 2005 the Jefferson County Coroner's Office issued a final determination regarding Anthony's death and ruled his death a suicide.

55. In March 2006 the Jefferson County Coroner's Office confirmed the finding of the original autopsy and investigation into Anthony's death determining that the cause of death was suicide.

56. The Federal Bureau of Investigation subsequently conducted an investigation which included the events surrounding Anthony's death.

57. On or about October 2, 2008 Kathie Sims was contacted by an FBI Agent who informed her that the FBI's investigation had determined that Anthony had not committed suicide, but had been murdered by a fellow inmate.

58. It was at that time that Kathie Sims learned about the manual locks on the shower door and that due to the failure of Jefferson County employees to confirm that the doors were properly locked, Shields would have been able to access Anthony through the shared shower.

59. Kathie Sims neither knew nor could have known prior to receiving information from the FBI's investigation that Jefferson County Sheriff's Department's custom, practice and policy which failed to secure and protect vulnerable inmates, such as Anthony, from dangerous inmates caused the death of her son.

60. Upon information and belief, an FBI agent interviewed Shields at CSP in 2008 regarding this incident.

61. During this interview, Shields informed the FBI agent that he had indeed murdered Anthony, as well as another former cellmate.

62. This information has been passed on to the Jefferson County District Attorney's office and they have undertaken a new investigation on this matter.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 –14th Amendment Due Process
### Deliberate Indifference to an Obvious Risk of Serious Harm
### (Against All Defendants)

63.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

64.     Anthony Sims was a pretrial detainee at all times relevant to this action.

65.     Defendants were acting under color of state law in their actions and inactions at all times relevant to this action.

66.     Defendants were deliberately indifferent to an obvious risk of serious harm by putting Anthony Sims into a situation which was virtually certain to, and did, result in an assault and his murder.  This was without necessity, right, legal justification or excuse and with such conscious or callous indifference to the rights of the Plaintiff as to rise to a level repugnant to the conscience of a reasonable person.

67.     Defendants knowingly inflicted unnecessary and wanton pain upon Plaintiff by allowing dangerous inmates, such as Shields, access to him while he was supposed to be in pc to protect him from such violent inmates, in violation of Anthony Sims' right to due process and to be free from assaults under the Fourteenth Amendment.

68.     Defendant John Doe exhibited deliberate indifference to the substantial risk of harm inflicted upon Anthony Sims by failing to ensure that the locking mechanisms on the shower doors in the administrative segregation unit were securely locked despite the known risk of substantial harm dangerous inmates posed to inmates who were housed in the administrative segregation unit for their protection, such as Anthony Sims.

69. Defendant Sheriff Mink knew of the substantial risk of serious harm posed by dangerous inmates housed in administrative segregation to inmates who were housed in the administrative segregation unit for their protection, including Anthony Sims. Such deliberate indifference to the safety and protection of inmates, who were housed in administrative segregation for their protection, resulted in the assault and murder of Anthony Sims and continues to pose a substantial risk of serous harm to other JCDF inmates.

70. Defendants failed to provide humane conditions of confinement for Anthony Sims and other similarly situated inmates by failing to implement practices, policies and procedures that protect inmates, including vulnerable inmates such as Anthony Sims, from the substantial risk of serious harm posed by dangerous inmates housed in administrative segregation.

71. Defendant Sheriff Mink, by and through his official duties, failed to and continues to fail to properly train, supervise and/or discipline their employees regarding the protection of inmates from assault, resulting in inhumane conditions of confinement and a deliberate indifference to the substantial risk of serious harm to Anthony Sims and other similarly situated inmates.

72. The inadequate training and/or supervision provided by Defendant Mink results from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Mink.

73. In light of the duties and responsibilities of the Jefferson County Sheriff Department's personnel who exercise control over individuals incarcerated at JCDF, the need for scrutiny in specialized training, supervision and discipline regarding the safety of inmates in protective custody is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in the violation of constitutional rights, such as those described herein, that

Defendant Mink is liable for their failure to appropriately train and/or supervise JCDF personnel. Such failure to properly train and supervise his employees was and continues to be the moving force and proximate cause of the violation of Anthony Sims' constitutional rights and the rights of other inmates.

74. The acts or omissions of each Defendant were the legal and proximate cause of Mr. Sims' damages in that he suffered an assault which resulted in his death while in Defendants' protective custody.

75. As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, and/or practices described above, Anthony Sims suffered an assault that resulted in his death.

76. Defendants' conduct in violating Anthony Sims' rights as described herein shocks the conscience and is intolerable to society's standards of fundamental fairness.

## SECOND CLAIM FOR RELIEF
## 42 U.S.C. § 1983 – 14th Amendment Substantive Due Process – Failure to Protect
### (Against All Defendants in Their Official Capacities)

77. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

78. Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

79. By incarcerating Anthony Sims and other similarly situated inmates, and thereby assuming control over the inmates and depriving them of their liberty to care for themselves, Defendants created a special relationship with Anthony Sims and other inmates that required Defendants to assume an affirmative duty of care and protection with respect to Anthony Sims and other inmates.

80. Defendants recklessly and with conscious disregard to the serious and obvious risk to inmate safety, failed to protect Anthony Sims and other inmates in administrative segregation from assaults by known dangerous inmates in the following ways:

    a. by failing to take any substantive remedial actions to ensure that the locking mechanism on the shower door in the administrative segregation unit was at all times securely locked, thereby restricting the access of extremely dangerous inmates to inmates housed in the administrative segregation unit for their safety and protection who were vulnerable to attacks; and

    b. by failing to properly train and/or supervise Jefferson County personnel to prevent and/or address assaults of vulnerable inmates in protective custody by inmates known to be dangerous to other inmates.

81. This conduct amounts to deliberate indifference to the rights of inmates in protective custody, including Anthony Sims, to be free from threat and assault from inmates known to be dangerous and who are housed in administrative segregation for the protection of the general population, and over whom prison officials exercise control.

82. The conduct is so grossly reckless that future assaults and attacks were and are virtually inevitable.

83. When viewed in total, this conduct shocks the conscience.

84. The acts or omissions of the Defendants were the legal and proximate cause of Anthony Sims' death.

85. The Defendants failed to and continue to fail to properly train, supervise and/or discipline their employees regarding the protection of vulnerable inmates in administrative segregation from assault by inmates known to be dangerous, resulting in a unconstitutional

failure to protect Anthony Sims from physical assault and murder and a unconstitutional failure to protect other inmates from assaults by dangerous inmates.

86. The inadequate training and/or supervision provided by the Defendants results from a conscious or deliberate choice to follow a course of action from among various alternatives available to the Defendants.

87. In light of the duties and responsibilities of the Jefferson County Sheriff's Office personnel who exercise control over individuals incarcerated at Jefferson County, the need for specialized training, supervision and discipline regarding the vulnerability of inmates housed in administrative segregation for their protection is so obvious, and the inadequacy of appropriate hiring, training and/or supervision is so likely to result in the violation of constitutional rights, such as those described herein, that the Defendants are liable for their failure to appropriately train and/or supervise JCDF personnel. Such failure to properly train and supervise their employees was and continues to be the moving force and proximate cause of the violation of Anthony Sims' and other inmates' constitutional right to protection from inmates known to be violent and dangerous.

88. Such policies, as well as Defendants' actions and inactions violated Anthony Sims' substantive due process right under the Fourteenth Amendments to the United States Constitution.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – 14th Amendment Substantive Due Process – Danger Creation
### (Against All Defendants in Their Official Capacities)

89. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

90. Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

91. Defendants created the danger that led to Anthony Sims' brutal murder and/or increased Anthony Sims' vulnerability to the attack that led to his death by the affirmative conduct of:

    a. failing to ensure that the locking mechanisms on the shower doors in the administrative segregation unit, which separated and limited access between inmates known to be violent and dangerous and inmates housed in the unit for their protection, was at all times securely locked; and

    b. choosing not to properly train and/or supervise Jefferson County personnel to prevent and/or address inmates' access to other inmates within the administrative segregation unit.

92. Anthony Sims and other inmates are members of a limited group of individuals at serious risk of assault by dangerous inmates such as those housed in the administrative segregation unit due to their propensity for violence.

93. Defendants' conduct placed Anthony Sims and other inmates at substantial risk of serious, immediate, and proximate harm – namely, allowing inmates known to be violent and dangerous access to inmates in protective custody who are most vulnerable to be targeted for assault.

94. Defendants acted recklessly and in conscious disregard of that obvious risk by placing inmates who are especially vulnerable to assault, such as Anthony Sims, in close physical proximity to inmates known to be violent and dangerous, such as Shawn Shields,

without taking even basic precautions to ensure that the locking mechanisms on the shower doors separating such individuals was at all times securely locked.

95. This conduct amounts to deliberate indifference to the rights of inmates in protective custody, including Anthony Sims, with whom inmates known to be dangerous and violent inevitably came into contact, and over whom they exercise control.

96. The conduct is so grossly reckless that future assaults were and are virtually inevitable.

97. When viewed in total, this conduct shocks the conscience.

98. The acts or omissions of the Defendants were the legal and proximate cause of Anthony Sims' death.

99. The Defendants failed to properly train, supervise and/or discipline their employees regarding the protection of vulnerable inmates in administrative segregation from assault by inmates known to be dangerous, resulting in a unconstitutional creation of danger and deliberate indifference to the substantial risk of serious harm to Anthony Sims and other inmates.

100. The inadequate training and/or supervision provided by the Defendants results from a conscious or deliberate choice to follow a course of action from among various alternatives available to the Defendants.

101. In light of the duties and responsibilities of the Jefferson County Sheriff's Department personnel who exercise control over individuals incarcerated at JCDF, the need for specialized training, supervision and discipline is so obvious, and the inadequacy of appropriate hiring, training and/or supervision regarding the vulnerability of inmates housed in administrative segregation for their protection is so likely to result in the violation of constitutional rights, such as those described herein, that the Defendants are liable for their

failure to appropriately train and/or supervise JCDF personnel.  Such failure to properly train and supervise their employees was and continues to be the moving force and proximate cause of the violation of Anthony Sims' and other inmates' substantive due process rights.

102.   Such policies, as well as the Defendants' actions and inactions violated Anthony Sims' substantive due process rights under the Fourteenth Amendment to the United States Constitution.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in the Estate's favor and against Defendants, and award the Estate all relief as allowed by law, including but not limited to, the following:

a. Prospective injunctive and declaratory relief and other appropriate equitable relief;

b. Actual economic damages as established at trial;

c. Compensatory damages, including, but not limited to, those for future pecuniary losses, physical and emotional pain, suffering, inconvenience, humiliation, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

d. Punitive damages for all claims allowed by law in an amount to be determined at trial;

e. Pre-judgment and post-judgment interest at the highest lawful rate;

f. Attorney's fees and costs; and

g. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 10th day of November 2009.

KILLMER, LANE & NEWMAN, LLP

*s/ Sara J. Rich*
_____

17

        David A. Lane
        Sara J. Rich
        1543 Champa St., Ste. 400
        Denver, CO  80202
        (303) 571-1000

        ATTORNEYS FOR PLAINTIFFS